### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRIAN KARAVISH, | : | CIVIL CASE NO. |
| Plaintiff, | : | 3:09-cv-935 (JCH) |
| | : | |
| v. | : | |
| | : | |
| CERIDIAN CORPORATION, | : | SEPTEMBER 6, 2011 |
| Defendant. | : | |

### RULING RE:  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 22)

**I.    INTRODUCTION**

Plaintiff, Brian Karavish, was a sales representative for Ceridian Corp. from December 2007, until his termination in September 2009.  Karavish brings this action claiming that Ceridian retaliated against him for taking leave under the Family and Medical Leave Act ("FMLA") from January 2009 to April 2009.  Karavish also claims that Ceridian violated Conn. Gen. Stat. § 31-72 by failing to pay commissions.  Pending before the court is Ceridian's Motion for Summary Judgment on both claims.  For the following reasons, Cerdian's Motion is granted.

**II.   FACTS**

Brian Karavish worked at Ceridian Corporation from December 17, 2007, until he was terminated on September 9, 2009.  Throughout this period, Karavish worked in sales, as a "Major Accounts Representative" (MAR).  His responsibilities included selling Ceridian products to assigned accounts, including potential customers who had not previously purchased Ceridian products.  He was responsible for making the initial contact with those potential customers and, if possible, arranging meetings, making

sales presentations, and closing sales.  His compensation included an annual salary and a commission on sales.  The payment of commissions was governed by a Sales Incentive Plan (SIP),[1] which was distributed by Ceridian to Karavish and other MARs.

Ceridian tracked work done by MARs.  MARs were responsible for making a record of each initial call to a new account, as well as any follow up calls, meetings, or sales presentations.  Once a potential customer had been contacted and the sales process had begun, an MAR would include that potential customer as an account in his "sales pipeline."  The MAR would assign an estimated value to accounts in his pipeline. Because these estimates involved speculation, Ceridian recommended that an MAR's pipeline should contain three or four times the amount of an MAR's sales quota.

Ceridian used the value of closed sales to determine commissions.  Generally, an MAR would have exclusive responsibility for an assigned account and would receive exclusive credit for any closed sale on an assigned account.  Where more than one representative was involved in a sale, the SIP gave Ceridian discretion to apportion credit for the sale for the purpose of determining the commission.  See SIP at 29 ("When more than one representative is assigned to a territory, [defined to include "a customer or group of customers or prospects,"] Ceridian will determine and assign the percentage and extent of participation in commission among those representatives."); SIP at 31 ("These commissions [earned during leave] may be reduced if management authorizes an SOV split to compensate a representative who is covering for the

---

[1] A full copy of the 2008 SIP was submitted to the court as Defendant's Exhibit 12.  Only portions of the 2009 SIP were submitted to the court.  Neither party claims that there is any material difference between the 2008 SIP and the 2009 SIP, and the portions submitted do not reveal any such difference. Therefore, the court relies on the 2008 SIP.

representative on an approved leave.").

From January 2008 to December 2008, Karavish had closed one sale for $1,940, and at the end of 2008, he had a sales pipeline of $365,000.[2]  His 2008 sales quota was $284,063.  Documents submitted by Ceridian show that only one MAR, Bob Horne, had a lower pipeline at the end of 2008, and Horne had been employed only since July 28, 2008.  Def. Ex. 4 at 69.  The other six MARs had pipelines ranging from $530,000 to $1,163,288.  Id.  These records also indicate that Bob Horne was placed on a "Success Plan" by Ceridian.  Id.

Kevin Hurley was Karavish's supervisor until Hurley resigned in July 2009.  On December 10, 2008, Hurley met with Karavish.  Hurley expressed his concerns about Karavish's sales performance in 2008 and his sales pipeline going into 2009.  Karavish admits that they discussed these concerns and that Hurley told him that he wanted to work more closely with Karavish and come up with ways to increase his sales pipeline and closed sales.  See Pl. Dep. at 121 ("[Hurley] said . . . we want to get something together where you and I can work together and either close some of these accounts or build that pipeline up.  And we're going to work more closely together to make you more successful.").  Karavish denies that Hurley specifically told him that he would be placed on something called a "Success Plan" at that meeting.  Afterwards, Karavish informed Hurley that he might need to take leave in the near future because his wife was pregnant, and there was some indication that there might be complications.

---

[2] Karavish received credit for an additional $83,824 sale, although he does not claim that he was responsible for the sale.  Karavish admits that that sale had been generated through the work of Kevin Hurley, who was promoted from MAR to District Vice President shortly after Karavish started working at Ceridian.  After his promotion, Hurley assigned the credit on certain of his accounts to Karavish and other new MARs, in order to help them get started.

In connection with the birth of his child, Karavish was away from work beginning January 6, 2009.  The parties appear to disagree about the date on which Karavish provided notice that he would take FMLA leave.  The documentary record shows the following.  Late Monday, January 5, 2009, Karavish emailed Hurley, referenced their December 10, 2008 meeting, and stated that he wanted to provide in writing "the 30 days notice I am required to give you if I need to go out on FMLA."  Pl. Ex. 6.  In an email dated Sunday, January 11, 2009, Karavish informed Hurley that he was planning on being out for two weeks, and that he would continue to be in touch with his current sales prospects during the upcoming week.  Pl. Ex. 7.  However, Karavish also indicated that he might need longer due to the possibility that his wife would need surgery.  Id.  In a Monday, January 12 reply, Hurley thanked Karavish for the update and asked, "Just so I can plan accordingly, when will you back in (surgery for your wife aside)."  Id.  On Tuesday, January 13, Karavish responded that he now planned to be out for the following week, i.e., the third week since he left.  Pl. Ex. 8.  On Wednesday, January 14, Hurley replied, "I need you back in the office on the 20th.  I will not approve anymore [sic] days past the 16th."  Id.  On Friday, January 16, Ceridian's Leave Administration Center sent Karavish a letter acknowledging that he had notified them on that same day of his need to take FMLA leave, stating that he was eligible for FMLA leave, and requesting documentation to confirm the purpose of the leave.  Def. Ex. 10.  On Sunday, January 18, Karavish emailed Hurley stating that, due to the medical needs of both his wife and his newborn son, he would "be going out on FMLA," and that he had now "made all the necessary contacts with HR."  Pl. Ex. 10.  Hurley replied the following day, thanked Karavish for the update, and noted that he had gotten word from

4

HR as well.  Id.  On February 2, 2009, Ceridian sent Karavish a letter confirming that he had been approved for 12 weeks of FMLA leave starting January 20, 2009.  Def. Ex. 11.

Thus, after providing prior notice that he might take FMLA leave, Karavish formally requested FMLA leave on Friday, January 16, 2009, and was granted leave from Monday, January 20 through April 16, 2009.  Karavish admits that he had no issues with anyone at Ceridian resisting or failing to approve his request for FMLA leave.  Plaintiff's Local Rule 56(a)(2) Statement ¶¶ 39, 40 [hereinafter "Pl. 56(a)(2) St."].

When Karavish went on leave, Hurley reassigned a number of Karavish's accounts to other MARs.  Hurley testified that he did so in order to keep the sales process moving.  Hurley Dep. at 138.  Karavish admits that Hurley had the right to do so under the SIP.  Pl. 56(a)(2) ¶ 43; see also SIP at 30 ("Territory management while an employee is on leave is at the discretion of the manager.").  During his leave, sales were closed on two accounts that had been reassigned to Kelly Cruz:  the Fuss & O'Neill account and the D.L. Ryan Partnership account.  Plaintiff's Memorandum in Opposition (Doc. No. 35-1) at 6 [hereinafter "Pl. Mem. in Opp."].  Cruz and Karavish had been sharing responsibility for the Fuss & O'Neill account before his leave:  Cruz had approached Karavish about sharing the account because she had an acquaintance at Fuss & O'Neill.  Pl. 56(a)(2) St. ¶ 55.  During the summer of 2008, Karavish and Cruz verbally agreed to work on the account together and to split the commission evenly.  When Karavish went on leave, Cruz assumed full responsibility for the account.  Id. ¶ 42.  In anticipation of his leave, Karavish approached Cruz about taking over the D.L. Ryan account as well; they agreed to the same commission split.  Id. ¶ 62.

Cruz closed sales on both accounts while Karavish was on leave.  Despite her

agreement with Karavish, Cruz approached Hurley and asked to be awarded the entire commission for both sales.  She argued that she had done all of the work on both accounts.  Hurley awarded the commissions entirely to Cruz.  Karavish admits that, under the terms of the SIP, his agreement to split the commission evenly was not binding on Ceridian and that it is not up to the MARs to determine how commissions should be apportioned.  Pl. 56(a)(2) St. ¶ 64.  However, Karavish disputes that the SIP gave Ceridian discretion to award the entire commission to Cruz.  Karavish contends that, under the SIP, he was entitled to a portion of the commission.

Karavish claims that he performed significant work on both accounts.  Karavish cites the testimony of Susan Pascual, a "solutions consultant" at Ceridian.  Pascual provided sales support for a number of Ceridian sales representatives, including Karavish and Cruz.  Pascual reviewed Ceridian's records of Karavish's work on the D.L. Ryan account and testified that he performed a "significant" work on that account.  Pascual Dep. at 83-84.  The records include notes memorializing numerous calls by Karavish throughout 2008, leading up to the scheduling of a sales meeting at the time Karavish had to take leave.  Pl. Ex. 22 at 14-20.  The records indicate that, in January 2009, Kelly Cruz took over and made sales presentations and a number of follow up calls during Karavish's leave.  Id.  Karavish does not cite record evidence indicating that he performed work on the Fuss & O'Neill account.  Cruz testified that Karavish attended one client meeting, at her insistence, because ""[i]f he was going to be working on the account, he needed to start participating."  Cruz Dep. at 11.

When Karavish returned from leave, Hurley did not return the reassigned accounts to Karavish.  Hurley testified that this decision was made after consulting his

6

supervisor and the SIP, and based on his knowledge of "where the accounts [were] . . . [and] the work that had gone into them during that time."  Hurley Dep. at 139.

On April 16, 2009, just after Karavish returned from leave, Hurley met with Karavish and imposed a "Success Plan."  The Success Plan is memorialized in a written memo from Hurley to Karavish.  Def. Ex. 2 at 13-14.  The Success Plan states that during the December 10, 2008 meeting between Hurley and Karavish, "I provided you with feedback on the concerns with your YTD sales performance end activity results . . . [and] we discussed my concerns around your pipeline entering 2009."  Id. at 13.  It further states that Karavish's 2008 performance was "below acceptable performance standards," listing certain specific shortcomings, including:  meeting only 30% of his $284,063 annual sales quota (this included the $83,000 sale that Karavish inherited from Hurley); having a sales pipeline "well below the expectation of 3 times your annual quota;" failing to meet expectations for the number of "dials" per week and per year; and failing to meet various other "scorecard" metrics.  Id.  The Success Plan lists 10 specific "goals" "to help drive you to focus on what will help you achieve your sales goals."  Id. These goals included making "a minimum of 60 dials each week;" attaining a "dials to First Call ration of 4%;" adding "1 unclassified opportunity to your pipeline each week . . . and 2 new qualified opportunity [sic] . . . to your pipeline in the first 30 days;" "[i]dentify your top 25 accounts;"  "adhere to minimum working hours of 8:30 a.m. to 5:30 p.m.;" "proactively invite [Hurley] to all upcoming sales calls;" and proactively schedule weekly meetings with Hurley to discuss progress.  Id. at 13-14.  The Success Plan memo states "improvement in performance must be accomplished . . . by 05.16.09," and that "[f]ailure to perform the expectations identified or lack of good faith

7

effort demonstrated during the plan period may result in disciplinary action up to and including termination."  Id.

Hurley testified that he had initially drafted the Success Plan during the first week of January, prior to Karavish's request for FMLA leave, Hurley Dep. at 140, and that he modified the Plan in April to account for the fact that Karavish was starting anew, without the accounts that had been transferred to other MARs during his leave, see id. at 139-40.  Ceridian submitted a marked-up draft of the Success Plan indicating that Hurley had prepared a draft dated January 7, 2009.  Def. Ex. 4 at 66-67.  The mark-up indicates that some of the substantive goals were modified between January and April. See id. (showing a reduction in the number of "new qualified opportunities" from 1 per week to 2 per 30 days; altering the required growth in pipeline value; deleting a requirement to "secure and attend 3 new face to face appointments each week").

Karavish admits that he did not meet some of the goals in the Success Plan over the course of the following month.  Pl. 56(a)(2) St. ¶ 72.  In particular, Karavish admits that he did not invite Hurley on his sales calls; that he missed targets for the number of "dials" and "first calls;" and that he did not timely provide a list of his top 25 accounts. Id. ¶¶ 73-76.  Karavish explained that he "decided not to" invite Hurley on sales calls, because "I was uncomfortable with Kevin [Hurley] at that point and I really didn't feel that he would be really helpful on those sales calls."  Pl. Dep. at 165.  When asked why he did not timely "identify [his] top 25 accounts," Karavish said only, "I can't tell you why."  Id. at 208.

On May 29, 2009, Hurley met with Karavish and issued a "Final Performance Improvement Plan."  Def. Ex. 2 at 20-21.  The Final Performance Improvement Plan

8

lists a number of  specific areas in which, according to Hurley, Karavish did not meet the goals of the Success Plan.  Id.  Like the Success Plan, the Final Performance Improvement Plan identifies 9 similar goals to be met over a period of 30 days and indicates that failure to meet the goals could result in termination.  Id.

Karavish admits that he did not meet all of the goals of the Final Performance Improvement Plan.  However, before the Final Performance Improvement Plan period ended, Hurley resigned from Ceridian, and in July 2009, Doug Leonard became Karavish's supervisor.  In what Ceridian claims was an effort to give Karavish a "fresh start with a new manager," Defendant's Local Rule 56(a)(1) Statement ¶ 83 [hereinafter "Def. 56(a)(1) St."], Leonard issued a new Final Performance Plan for Karavish on July 22, 2009.  This plan lists 7 "expectations," similar in content to the goals in the previous Final Performance Improvement Plan and the Success Plan.  Def. Ex. 2 at 17-18.  The Plan indicates that the period would run through August 22, 2009, and that failure to meet the expectations may result in termination.

Karavish admits that he did not meet some of the expectations set forth in the Final Performance Plan.   On August 20, 2009, when the 30 day period of the second Final Performance Plan was nearly up, Leonard sent an email to Karavish, expressing concerns about Karavish's lack of progress.  Leonard wrote, "From my perspective, I don't think that you've made positive progress in the last few weeks."  Def. Ex. 2 at 24. Leonard specifically complained about Karavish's failure to communicate with him about deals and ongoing sales efforts, and his failure to invite Leonard on any of the 3 sales calls Karavish had recorded since July 22 or to meet with him for "pre-call planning" or post-call debriefing.  Id. at 24-25.  Leonard closed, "I have to say that the last month has

not gone well and that I am not impressed with your progress.  If we do not see a substantial and immediate turn around, we will be forced to terminate you for cause." Id. at 25.  On September 9, 2009, Ceridian terminated Karavish.

Karavish admits that Leonard did not retaliate against him.  Pl. 56(a)(2) St. ¶ 91; Pl. Dep. at 209 (Q:  "Do you believe that Doug Leonard retaliated against you in any way?"  A:  "No.").  Karavish admits that he did not meet some of the goals set forth in each of the plans.  Karavish also admits that he had not closed a sale in the nearly 5 months that he had been back from FMLA leave.

## III.  SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).  Once the moving party has met its burden, in order to defeat the motion, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record to address questions of fact, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  Summary judgment "is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).  "When reasonable persons, applying the proper legal standards, could differ in

10

their responses to the question" raised on the basis of the evidence presented, the question must be left to the finder of fact.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## IV.    DISCUSSION

The Complaint contains two Counts:  a claim for violation of the FMLA, and a claim pursuant to Conn. Gen. Stat. § 31-72.  Ceridian seeks summary judgment on both claims.

### A.    Count One:  FMLA Retaliation

In the Complaint, Karavish alleges that Ceridian "interfered with the exercise of plaintiff's rights under the FMLA, and has retaliated against the plaintiff for exercising his FMLA rights . . . ."  Complaint ¶ 43.  However, Karavish admits that "Ceridian approved Plaintiff's FMLA leave request without issue," Pl. 56(a)(2) St. ¶ 39, and that he "never had any issues with anyone at Ceridian resisting or failing to approve his request for FMLA leave," id. ¶ 40.  In his Opposition, Karavish argues his claim as one for retaliation.  See, e.g., Pl. Mem. in Opp. at 1 ("Specifically, plaintiff objects on the ground that the defendant retaliated against the plaintiff . . . .").  Therefore, the court takes Karavish's FMLA claim to be a retaliation claim, not an interference claim.

A claim for FMLA retaliation is analyzed under the McDonnell Douglas burden-shifting framework.  See Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004) (per curiam).  A plaintiff is required to establish a prima facie case, by showing that:

> 1) that he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.

11

Id.  It is then the defendant's burden to proffer a non-retaliatory reason for the adverse employment action.  If it has done so, "the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for [retaliation]."  Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir.2000).  "[O]nce the employer has proffered its non[retaliatory] reason, the employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited [retaliation]."  James v. New York Racing Ass'n, 233 F.3d 149, 154 (2d Cir.2000).

Proof that an employer's proffered reason is false can provide support for an inference of retaliatory intent.  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").  However, "there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was [retaliatory]."  Id. at 148; see James, 233 F.3d at 156-57 (affirming summary judgment in favor of employer, in spite of employee's prima facie case and evidence that the employer's proffered reason was false).  Thus, even if the plaintiff has established a prima facie case and presented evidence that contradicts the employer's proffered reason, the court must still "examine the entire record and, in accordance with Reeves, make the case-specific assessment as to whether a finding of [retaliation] may reasonably be made."  Zimmerman v. Assocs. First Capital Corp., 251 F.3d 376, 382 (2d Cir. 2001).

12

Here, the parties' arguments focus on two issues:  whether Karavish exercised

rights under the FMLA (prong 1 of the <u>prima facie</u> case) and whether the record

supports a reasonable inference of retaliatory intent (an issue encompassing both prong

4 of the <u>prima facie</u> case and the issue of pretext).

1.      <u>First Prong:  Exercise of FMLA Rights</u>

Ceridian claims that Karavish was not an "eligible employee" under the FMLA

because Ceridian employs fewer than 50 employees within 75 miles of the Farmington

office, where Karavish worked.  <u>See</u> 29 U.S.C. § 2611(2)(B)(ii) (excluding employees

from eligibility where the employer has fewer than 50 employees within 75 miles).

Karavish responds that Ceridian should be estopped from contesting his eligbility for

FMLA leave.

"Under federal law, a party may be estopped from pursuing a claim or defense

where:  1) the party to be estopped makes a misrepresentation of fact to the other party

with reason to believe that the other party will rely upon it; 2) and the other party

reasonably relies upon it; 3) to her detriment."  <u>Kosakow v. New Rochelle Radiology</u>

<u>Assocs., P.C.</u>, 274 F.3d 706, 725 (2d Cir. 2001).  Equitable estoppel does not require

bad faith or an intent to deceive, but instead requires "only a 'material' or 'definite'

misrepresentation."  <u>Id.</u> at 726.  Equitable estoppel has been applied in FMLA retaliation

cases to prevent an employer from arguing that the employee was ineligible for FMLA

protection in the first place.  <u>Id.</u> at 727 ("[T]he district court could conclude that New

Rochelle is estopped from maintaining that Kosakow was ineligible for FMLA

protection."); <u>Reaux v. Infohealth Management Corp.</u>, No. 08-cv-5068, 2009 WL

635468, *3-4 (N.D. Ill. March 10, 2009) (denying employer's motion to dismiss because

13

the employer had informed the employee that she was eligible for FMLA leave).

Ceridian represented to Karavish that he was both eligible and approved for FMLA leave.  On January 16, 2009, Ceridian wrote to Karavish, stating, "your eligibility has been reviewed and you are eligible for the following policies:  Family and Medical Leave Act of 1993 . . . ."  Def. Ex. 10.  The letter explained that, in order to have his FMLA leave officially approved, Karavish simply needed to provide legal documentation to "support your need for leave."  Id.  On February 2, 2009, Ceridian confirmed:  "Your leave has been certified (approved). . . . 01/20/2009 – 04/13/2009:  Approved, Family and Medical Leave Act."  Def. Ex. 11.

Karavish did in fact take FMLA leave, and the record supports his claim that he relied on Ceridian's representations in doing so.  Karavish informed Hurley that he would be taking FMLA leave only after he had made the "necessary contacts with HR" and received the letter indicating his eligibility for FMLA leave.  See Pl. Ex. 10.  Ceridian has not disputed that Karavish relied on Ceridian's representations of eligibility. Therefore, for purposes of Ceridian's Motion for Summary Judgment, Karavish has adequately supported the first two elements of equitable estoppel.

The third element – whether or not Karavish's reliance was to his detriment – presents a question that goes to the merits of his FMLA retaliation claim.  If Ceridian retaliated against Karavish, then his decision to rely on Ceridian's representation that he was eligible for leave was certainly to Karavish's detriment.  Therefore, Ceridian's argument that Karavish is not an eligible employee does not provide an independent basis for summary judgment, apart from the issue of whether or not Ceridian retaliated. The court must instead determine whether there is a material issue of fact as to whether

14

Ceridian retaliated against Karavish.

2.    Fourth Prong: Inference of Retaliation and Pretext

Karavish identifies three actions that he claims were taken in retaliation for his FMLA leave:  (1) his termination; (2) Ceridian's decision to assign certain of Karavish's accounts to other salespeople during his leave and not to reassign them after his leave; and (3) Ceridian's failure to provide credit or pay commissions to Karavish for the two sales that were closed by Kelly Cruz during Karavish's leave.  Ceridian argues that each of these actions was motivated by legitimate, non-retaliatory, business reasons. Therefore, under this heading, the court considers whether Karavish has submitted sufficient evidence from which a jury could reasonably conclude both that Ceridian's proffered reasons are false and that the real reasons were retaliatory.

a.    Termination

Ceridian claims to have fired Karavish due to his inadequate sales performance and his failure to meet the terms of three performance plans.  Karavish has not submitted evidence from which a factfinder could reasonably conclude that these reasons are false or that the real reason was retaliation.

It is undisputed that, in his first full year of employment, Karavish closed one sale, and the value of that sale ($1,940) was less than one percent of his sales quota for that year ($284,063).  It is undisputed that shortly before Karavish provided notice that he would be taking FMLA leave, Karavish's supervisor met with Karavish; told Karavish that his performance was not satisfactory; and told Karavish that he would develop a plan to work more closely with Karavish in an effort to improve his performance.  The record indicates that Hurley developed such a plan prior to Karavish's decision to take

15

FMLA leave, and that he imposed a modified version of that plan when Karavish returned.  It is undisputed that Karavish failed to meet the terms of that plan.  It is undisputed that, although the terms of the plan provided that failure to meet the terms of the plan could result in termination, Ceridian did not terminate him based on that failure, but instead imposed another similar plan.  It is undisputed that, when Karavish failed to meet the terms of that second plan, Ceridian chose not to terminate him.  Instead, Karavish's new supervisor, Doug Leonard imposed a third similar plan.  It is undisputed that Karavish did not meet the terms of that third plan either.  Thus, there is no dispute that Ceridian terminated Karavish almost five months after he returned from FMLA leave, during which time Karavish failed to meet the terms of three successive plans and failed to close a single sale.

Karavish contends that the performance plans were unfair and unrealistic.[3] Karavish complains, for example, that, under the plans, he was faulted for not meeting an expectation of 60 "power phone dials" per week, while "Hurley did not require and/or discipline Cruz for averaging a mere 34.9 power phone dials per week during the same period . . . ."  Pl. Sur-Reply at 5.[4]  The record does not unequivocally support this claim.

---

[3] The record shows that Karavish was not the only sales representative that Hurley placed on a "Success Plan."  Bob Horne, whose sales pipeline at the end of 2008 was comparable to Karavish's, was also placed on a success plan.  See Def. Ex. 4 at 69.  An employee named Matthew Stafford was also placed on a success plan at some point.  See Hurley Dep. at 191. The terms and results of their success plans are not discussed by the parties. This lack of information prevents any meaningful comparison of these two cases. Nonetheless, Karavish suggests that it is somehow important that Hurley did not transfer accounts away from Horne or Stafford prior to placing them on a success plan.  See Hurley Dep. at 191-92. The argument is odd.  No one contends that Karavish's accounts were transferred as a part of his Success Plan.  Rather, they were transferred due to Karavish's leave.  There is no indication that there was any reason why Hurley should have transferred accounts from Stafford or Horne.  Accordingly, Hurley's decision not to transfer their accounts appears to be irrelevant.

[4] Karavish's Sur-Reply, like his overlength opposition memorandum, was submitted without leave of the court.  Local Rule 7(a)(2) provides that "memoranda shall not exceed forty (40) 8½" by 11" pages . . . ," and the Chambers Practices of the undersigned state that, "the Local Rules contemplate a brief in

16

Cruz testified that she was verbally disciplined for failing to make 60 dials per week. Cruz Dep. at 60.  But even if this were not so, Cruz and Karavish were not similarly situated employees.  There is no dispute that Cruz was a particularly effective salesperson.  See Pl. Dep. at 35 ("[S]he was a good sales rep and she knew what she was doing . . . .").  Cruz testified that she was Ceridian's top-ranked MAR, nationally, in 2009.  Cruz Dep. at 57.  Ceridian records show that, while Karavish's 2008 Year End Pipeline was $365,000, Cruz's was $1,025,971.  Def. Ex. 4 at 69.  At one point in 2009, Cruz had credit for $423,534 in sales, while Karavish had $0.  Id.  Even if these numbers were adjusted so that credit for the two contested sales closed by Cruz were split evenly with Karavish, as Karavish seeks, Cruz's adjusted sales ($339,802) would still have been more than four times Karavish's adjusted sales ($83,732).  See Pl. Aff. ¶ 64 (claiming that half of the two contested sales amounted to $83,732).  Therefore, even if Hurley did enforce the 60 dials expectation more strictly against Karavish, a finder of fact could not reasonably infer it was due to the fact that Karavish went on leave, rather than the fact that Cruz was getting better results.

Furthermore, the "power phone dials" expectation was neither the only, nor the most important, expectation that Karavish failed to meet.  Karavish failed to meet other terms of the plans that cannot be described as either unfair or unrealistic.  It is uncontested that one of the terms Karavish failed to comply with was to invite his supervisor to join him on sales calls.  Pl. 56(a)(2) St. ¶ 73.  Karavish admits that, although the Success Plan and Final Performance Improvement Plan required him to

---

support of a motion, a responsive brief, and a reply brief.  [The undersigned] expects that any subsequent briefing will be accompanied by a motion for permission to file."  Karavish filed no such motion.

"proactively invite" Hurley on sales calls, Karavish "decided not to."  Pl. Dep. at 165.

Karavish explained, "I was uncomfortable with Kevin [Hurley] at that point and I really

didn't feel that he would be really helpful on those sales calls."  Id.  Karavish also admits

that he did not comply with the term of the Success Plan requiring him to "identify [his]

top 25 accounts."  Pl. 56(a)(2) St. ¶ 76.  When asked why he did not, Karavish said

only, "I can't tell you why."  Pl. Dep. at 208.

Karavish argues that Hurley retaliated against him, but Hurley was no longer

working at Ceridian at the time Karavish was terminated.  Karavish's new supervisor,

Doug Leonard, wrote to Karavish on August 20, 2009—four months after Karavish's

return from FMLA leave and two to three weeks before Karavish was terminated.  Def.

Ex. 2 at 24-25.  Leonard expressed a number of serious concerns about Karavish's

performance, including the fact that Karavish had not invited him on sales calls, had not

met with him to do pre-call planning, and had not met with him to do post-call debriefing.

Id.  Leonard stated that, "from [his] perspective," Karavish had not "made positive

progress in the last few weeks," id. at 24, and that, barring a "substantial and immediate

turn around, we will be forced to terminate you for cause," id. at 25.  Karavish admits

that Leonard did not retaliate against him for taking FMLA leave.  Pl. 56(a)(2) St. ¶ 91.

Karavish argues that there would have been no basis for his termination if he had

been given credit for the sales that Kelly Cruz closed during his leave or if his old

accounts had been reassigned to him when he returned.  This argument is speculative.

The fifty percent credit he claims ($83,732) would not have put him at or near his sales

quota for 2009 ($400,000), and there is no basis for inferring that reassignment of his

old accounts would have significantly improved his performance after he returned from

18

leave.  This argument also does not address the fact that Karavish refused to comply with the measures requiring him to communicate with management and invite management along on sales calls.  Hurley testified that these requirements were particularly important to him.  Hurley Dep. at 190 ("I wanted to have a better understanding of what he was out there doing, and I wanted to have a better understanding if in fact this was going to make him more successful . . . .").  The importance of these requirements is underscored by Karavish's testimony that, in December 10, 2008, Hurley expressed his intention to "get something together where you and I can work together" and "to work more closely together to make you more successful."  Pl. Dep. at 121.  Furthermore, Karavish's failure to communicate and work collaboratively with his supervisor were the issues that Leonard emphasized in his August 20, 2009 email indicating that Karavish would very likely be terminated.  Def. Ex. 2 at 24-25.

Given the undisputed facts that Karavish's actual sales performance was well below expectation, that these concerns were expressed prior to his FMLA leave, that he was given numerous opportunities to improve his performance over the four to five months following his FMLA leave, and that he failed to comply with reasonable demands to work more closely with his supervisors, Karavish has failed to raise a material issue of fact as to whether he was fired in circumstances giving rise to an inference of retaliatory intent.  That Ceridian terminated Karavish for legitimate, performance-related concerns is strongly corroborated by Leonard's August 2009 assessment of his performance, an assessment that Karavish does not contend was colored by any retaliatory intent.  Based on this record, a reasonable finder of fact could

not conclude that Ceridian's stated rationale for the termination was false or that Karavish was terminated in retaliation for taking FMLA leave.  Therefore, Ceridian is entitled to summary judgment insofar as the FMLA retaliation claim is based on Karavish's termination.

b.      Failure to Return Accounts to Karavish

During Karavish's leave, Hurley transferred a number of Karavish's active accounts to other sales representatives.  Hurley testified that he did so in order to "keep the business moving," and "keep those accounts moving forward."  Hurley Dep. at 138. Karavish does not contest that the SIP provided Hurley with discretion to do this.  SIP at 30 ("Territory management while an employee is on leave is at the discretion of the manager.").  When Karavish returned, Hurley chose not to return those accounts to Karavish.  Hurley testified that he consulted with his own supervisor, consulted the SIP, and considered "where the accounts, each one was respectively with the work that had gone into them during that time, and made the decision based on that to keep those [accounts] with the representatives that they were reassigned to."  Hurley Dep. at 139; accord id. at 177 ("I just know that for those grouping of accounts, I made that business decision to keep them with the individuals that had begun working on them.").

It is not clear that the decision to transfer these accounts should be deemed an adverse employment action.  See Bruno v. Sonalysts, Inc., 3:01-cv-1501 (MRK), 2004 U.S. Dist. Lexis 23848, *15-16 (D. Conn. Nov. 23, 2004) (holding that an employee's removal from a lucrative account was not an adverse employment action and that there was a lack of evidence showing that that the transfer was retaliatory).  However, assuming that it was an adverse employment action, Karavish has not adduced

20

evidence from which a jury could reasonably infer that Hurley's proffered explanation for the decision was merely a pretext for retaliation.  Karavish cites no provision of the SIP that required Hurley to return those accounts to Karavish, nor any evidence concerning Ceridian's general practices with regard to transferring accounts.

Karavish emphasizes Hurley's January 14 email, which states, "I need you back in the office on the 20th.  I will not approve anymore days past the 16th."  Pl. Ex. 8. Hurley sent that email prior to Karavish's decision to take FMLA leave and in response to Karavish's statement that he would be taking a third week off, rather than the two weeks that he had previously indicated.  Although Karavish had indicated at various points that he might take FMLA leave, he had not yet indicated that he had decided to do so.  Decisions to approve or deny FMLA leave are made by Ceridian's human resources staff, not by Hurley.  See Ceridian Family Medical Leave Policy at 2 (Def. Ex.4 at 8) ( "Application for FMLA leave is made by contacting Ceridian Leave Administration . . . .").  Thus, Hurley's email presumably concerned his lack of willingness to approve a third week of non-FMLA leave.  When Karavish subsequently informed Hurley that he had contacted HR and made arrangements to take FMLA leave, Hurley thanked Karavish, Pl. Ex. 10, and there is no evidence that Hurley expressed any frustration about Karavish's extended leave.

It is reasonable that a manager would not want to disrupt the sales process by transferring active sales accounts any more than necessary.  A single email indicating Hurley's unwillingness to extend Karavish's leave does not provide a basis to infer that, months later, when Hurley decided not to re-transfer the accounts, Hurley was retaliating against Karavish for taking FMLA leave.  Karavish has failed to present

evidence from which a reasonable jury could infer that Hurley's stated reason was a pretext for retaliation.  Accordingly, Ceridian is entitled to summary judgment insofar as Karavish's claim is based on the transfer of Karavish's accounts.

c.     Failure to Pay Commissions to Karavish

Karavish argues that the decision to credit Kelly Cruz with the two sales that closed during his leave was retaliatory.  Ceridian contends that the decision to award the commissions entirely to Cruz was involved a discretionary business judgment, based upon the "overwhelming evidence," Def. 56(a)(1) St. ¶ 65, that Cruz was responsible for closing the sales.  See Defendant's Memorandum in Support (Doc. No. 23) at 23-24 [hereinafter "Def. Mem in Supp."].  Both Hurley and Cruz testified that, in their judgment, Cruz performed the work that was responsible for closing the sales.  See Hurley Dep. at 105; Cruz Dep. at 38.  Therefore, it is Karavish's burden to provide evidence from which a finder of fact could reasonably conclude that this reason is false and that the commission decisions were actually motivated by retaliatory intent.

Karavish contests Ceridian's claim that the commission decision was within its discretion.  Karavish argues that the decision was contrary to the SIP, and that retaliatory intent may be inferred from this fact.  Karavish relies on one passage in the SIP, which provides that "commissions may be reduced if management authorizes an SOV split to compensate a representative who is covering for the representative on an approved leave."  SIP at 31.  Karavish contends that this language authorizes Ceridian to award a portion of the commission to both employees, not to award all of the commission to the employee who is covering during the leave.

However, Karavish admits that the Cruz was not merely "covering" for Karavish

22

during an approved leave, and that the accounts had been transferred to her instead. See Pl. Aff. ¶ 65 ("Nothing prevented Hurley from allowing Cruz to cover my accounts . . . without transferring the accounts to Cruz's account list and eliminating the accounts from my list."); id. ¶ 56 ("By transferring those accounts to another major account representatives [sic], those accounts became a part of their current pipeline."); Pl. 56(a)(2) St. ¶ 42 (admitting that "Hurley reassigned the DL Ryan Partnership . . . and Fuss & O'Neill accounts to Ms. Cruz"); see also Hurley Dep. at 138-39 (testifying that the accounts were transferred to Cruz prior to the sales).

Although Karavish asserts that Hurley "should have allowed the accounts to be in plaintiff's account list and Cruz's account list . . .," rather than reassigning them, Pl. Aff. ¶ 66, Karavish cites no provision of the SIP (or any other authority) that obliged Hurley to do so. To the contrary, the SIP provides that Hurley had the discretion to transfer the accounts.  See SIP at 30 ("Territory management while an employee is on leave is at the discretion of the manager."); id. at 31-32 ("Ceridian reserves the right, without prior notice, to . . . [m]ake changes to an employee's . . . territory assignment."); id. at 29 (defining "territory" to include a particular "customer or group of customers or prospects.").

The fact that the accounts were reassigned, and that Cruz was not merely covering, is significant.  Karavish cites no provision of the SIP that imposes any obligation to pay a commission to an employee who had previously been assigned to an account where the sale closed after the transfer.  The SIP does provide that "[w]hen more than one representative is assigned to a territory, Ceridian will determine and assign the percentage and extent of participation in commission among those

representatives." SIP at 29. This passage does not impose an obligation to pay any commission to a representative who, like Karavish, had been assigned to an account prior to a sale. Where this passage does apply, it does not limit Ceridian's discretion to assign a percentage of zero to any particular representative.[5] Thus, Karavish has failed to support his claim that the decision to award the commissions entirely to Cruz was contrary to the SIP.

In any case, the terms of the SIP are relevant to Karavish's FMLA claim only insofar as they might support an inference that Ceridian's stated rationale was false and a pretext for retaliation. Even if the terms of the SIP left any doubt about Hurley's discretion to award the commissions to Cruz, this would fall short of supporting an inference that Hurley was actually retaliating against Karavish. Hurley testified that he considered each of the specific passages mentioned above when making the decision to award the credit to Cruz. See Hurley Dep. at 160-63. Hurley testified that he consulted with his supervisor and with the HR department, and that based on that consultation, he believed the SIP gave him discretion to award the full commission to Cruz. See id. Hurley's reading of the SIP is, at a minimum, one that could be reached in good faith. Therefore, the allegations of non-compliance with SIP do not support an inference of pretext or retaliatory intent.[6]

---

[5] The SIP also provides that Ceridian reserves the right to "[s]ettle any matters not covered by the provisions of the [SIP], or needing further interpretation, in a manner subject to Ceridian's sole discretion." SIP at 32.

[6] In his discussion of the SIP, Karavish draws unreasonable inferences from his email correspondence with Human Resources staff. See Pl. Mem. in Opp. at 28-29. In response to a general policy inquiry from Karavish, an employee in HR, Elizabeth Maus, explained the policy on payment of commissions earned during leave. Maus explained that employees become eligible to receive any commissions earned during leave only 30 days after they return from leave. Pl. Ex. 20. The email is a general statement of policy and does not indicate that Karavish had earned a commission during his

Karavish also takes issue with Ceridian's assessment of his contribution to the sales. However, Karavish does not cite business records, testimony, or any other evidence of any work that he performed on the Fuss & O'Neill account. In his Affidavit, Karavish makes a number of claims about the work that he performed on the D.L. Ryan account, see Pl. Aff. ¶¶ 29-35, but he makes no similar claims about the Fuss & O'Neill account. The record does indicate that Karavish accompanied Cruz to one lunch meeting with Fuss & O'Neill representatives. Cruz Dep. at 11. However, Cruz testified that she asked Karavish to attend that meeting because "[i]f he was going to be working on the account, he needed to start participating." Id. Therefore, with respect to the Fuss & O'Neill account, Karavish has not provided any evidence that indicates that Ceridian's assessment of his and Cruz's contributions was incorrect.

Karavish does submit evidence indicating that he performed work on the D.L. Ryan account. In addition to the claims in his Affidavit, Karavish cites Cerdian business records showing that he had numerous communications with D.L. Ryan representatives during 2008 and that he was in the process of scheduling a sales presentation just before he went on leave. See Pl. Ex. 22 at 14-20. Susan Pascual, a Ceridian employee who provided sales support to Cruz on the D.L. Ryan account, reviewed these records and testified that Karavish had performed "significant" work on the account. Pascual Dep. at 83-84.

The evidence of Karavish's work on the D.L. Ryan account is not directly

---

leave. Karavish responded, "So it sounds like I'll be paid on everything but not until I return (30 days after)," Pl. Ex. 21, and Maus did not reply. There is no evidence that Maus had any knowledge about whether Karavish was entitled to a commission on any particular sale. There is no evidence that Maus's failure to reply was in any way an endorsement of Karavish's unstated assumption that he had, in fact, earned a commission during leave. It is not reasonable to infer that Maus's failure to reply indicated that she had any view on whether Karavish was entitled to any particular commission.

inconsistent with Ceridian's proffered rationale for the commission decision.[7]  Ceridian

does not argue that the decision was justified by the apparently false claim that

Karavish had done no work associated with the account, but rather that the decision

was based on a discretionary business judgment about the relative importance of the

work done by Cruz.  See Def. Mem. in Supp. at 23-24; see also Hurley Dep. at 105 (the

commission decision was "based on Kelly's feedback of the work that had gone into the

sale and respective participation in that effort" and "also based on my participation in

certain parts of this deal and seeing the work that Kelly put into it").  While Pascual

testified that the work Karavish performed on the account was "significant," she did not

provide a comparative assessment of Karavish's and Cruz's relative contributions to the

sale, and she did not testify that Ceridian's judgment on the issue was inconsistent with

the records that she reviewed.  In addition, Ceridian provided evidence that Cruz

performed certain kinds of work that directly led to the sale.  Cruz held in-person

meetings with D.L. Ryan, performed presentations and product demonstrations,

provided a sales proposal to D.L. Ryan, and finalized the sale.  See Def. Mem. in Supp.

at 23-24; Def. 56(a)(1) St. ¶¶ 48-53.  Karavish does not contend that he performed such

work.  See Pl. 56(a)(2) St. ¶ 52.  Therefore, Karavish's evidence that he did perform

"significant" work on the D.L. Ryan account creates an issue of fact that is related to

Ceridian's proffered reason, but does not directly contradict that proffered reason.

Crediting that evidence, a factfinder could reasonably infer that the Ceridian's

---

[7] Karavish's evidence does conflict with Cruz's assertion that Karavish "didn't do any of the work" on the D.L. Ryan account.  Cruz Dep. at 38.  However, Cruz acknowledged that this was an overstatement.  Id. at 72 ("[Karavish did] work, but it wasn't work towards closing or moving D.L. Ryan through a process to close the business.").  She characterized that work as "marketing to the account," as opposed to closing a sale.  See id.  In any case, it was Hurley and Ceridian who were responsible for the commission decision, not Cruz.

commission decision was not inevitable--i.e., that the facts that would have permitted

Ceridian to make a different decision--but not that the stated reasons for Ceridian's

decision were false or pretextual.

The evidence of Karavish's work on the D.L. Ryan account might permit a

stronger inference if there was evidence that Ceridian awarded commissions to other

employees based on similar work, but there is not.  Instead, Karavish relies on one

instance in which Gus Meijas, a sales representative who worked for Ceridian in

Maryland, allegedly received a 25% commission based on his personal relationship to

the client.  Karavish's description of this instance is based on the deposition of Kelly

Cruz, who claims to have closed that sale as well.  According to Cruz, Meijas had "a

connection" with the "VP of Procurement" for the customer, and Meijas referred that

customer to Cruz or to Cruz's team in Connecticut.  See Cruz Dep. at 21.  Cruz testified

that, at that time, when a representative made a referral on an account in someone

else's territory, the referring representative would generally receive credit for at least 25

percent of the resulting sale.  Id. at 22-23.  Assuming that this is an accurate statement

of Ceridian's general practice at the time, it is not applicable to Karavish's case.

Karavish did not make a referral based on a personal connection to the customer.  The

alleged practice of awarding commissions to employees who make referrals based on

personal connections does not support a reasonable inference that Ceridian's decision

not to award a commission based on the work performed by Karavish was retaliatory.

In sum, Karavish has failed to present evidence from which a trier of fact could

reasonably conclude that Ceridian's stated reasons for awarding the commissions to

Cruz were a pretext for retaliation.  Under the terms of the SIP, Ceridian and Hurley had

discretion to award the commissions on the two sales to Cruz.  Ceridian argues that, in

the exercise of that discretion, the commissions were awarded to Cruz based on her

substantive contributions to the two sales.  Karavish has failed to identify any evidence

that would suggest that this proffered rationale was false with respect to the Fuss &

O'Neill commission.  With respect to the D.L. Ryan, the evidence that Karavish

performed work on the account before Cruz took over is not sufficient to support a

reasonable inference of pretext or retaliatory intent, where the record shows that Cruz

did perform the work that contributed directly to the sale and where there is an absence

of evidence that Ceridian awarded a share of a commission to other MARs based on

comparable work.  Therefore, Ceridian is entitled to summary judgment on Karavish's

FMLA retaliation claim.

### B.  Count Two:  Conn. Gen. Stat. § 31-72

Ceridian is also entitled to summary judgment on Karavish's claim that Ceridian

violated Conn. Gen. Stat. § 31-72 by failing to pay commissions on the D.L. Ryan and

Fuss & O'Neill accounts.  Connecticut's wage statutes, including Conn. Gen. Stat. § 31-

72, do not create substantive obligations regarding the payment of employees; "rather,

they provide remedial protections for those cases in which the employer-employee

wage agreement is violated."  Mytech v. May Dep't Stores Co., 260 Conn. 152, 162

(2002).  Thus, a claim under Conn. Gen. Stat. § 31-72 requires an employee to show

that the employer breached an obligation to pay wages that arises from an employer-

employee agreement.  Karavish asserts that "Defendant was obligated per its Sales

Plan to pay at least 50% of the commissions to the plaintiff."  Pl. Mem. in Opp. at 48.

Karavish supports this claim only by citation to the page in the SIP that indicates that a

28

commission "may be reduced if management authorizes an SOV split to compensate a representative who is covering for the representative on an approved leave."  SIP at 31. As discussed above, that provision is inapplicable to this case.  Karavish admits that the two accounts had been reassigned to Cruz and that she was not merely "covering" during his leave.  Pl. Aff. ¶¶ 56, 65-66.  Under the applicable terms of the SIP, Ceridian had discretion to award the entire commission to Cruz.  See supra at 23-24.

Moreover, no provision of the SIP supports Karavish's claim that Ceridian was obligated to pay 50% of the commission, or any other particular percentage.  The only apparent basis for claiming an obligation to pay 50% is Karavish's two verbal agreements with Cruz, but Karavish admits that those agreements were not binding upon Ceridian.  See Pl. 56(a)(2) St. ¶ 64 (admitting that "MARs did not have authority to decide commission splits").

Because Ceridian had discretion to apportion the commission, including discretion to award the commission entirely to Cruz, Karavish cannot establish a claim under Conn. Gen. Stat. § 31-72, and Ceridian is entitled to summary judgment.

## V.    CONCLUSION

For the foregoing reasons, Ceridian's Motion for Summary Judgment (Doc. No. 22) is **granted**.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 6th day of September, 2011.

　　　　　　　　　　　　  /s/ Janet C. Hall　　　　　　
　　　　　　　　　　　　Janet C. Hall
　　　　　　　　　　　　United States District Judge

29